**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

THE NEW YORK TIMES COMPANY and CHARLIE
SAVAGE,

                        Plaintiffs,

        v.                                                          No. 25-cv-9375

DEPARTMENT OF DEFENSE,

                        Defendant.

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' CROSS-MOTION FOR**
**SUMMARY JUDGMENT AND IN OPPOSITION TO DEFENDANT'S MOTION FOR**
**<u>SUMMARY JUDGMENT</u>**

David McCraw
Jackson Busch
The New York Times Company
Legal Department
620 8th Avenue
New York, NY 10018
Phone: (212) 556-4031
Email: mccraw@nytimes.com
        jackson.busch@nytimes.com

*Attorneys for Plaintiffs*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................................... ii

PRELIMINARY STATEMENT ................................................................................................. 1

BACKGROUND ......................................................................................................................... 2

    I.    The boat strikes.............................................................................................................. 2

        A.    The September 2 strike............................................................................................ 2

        B.    The October 16 strike. ........................................................................................... 3

        C.    The October 27 strikes. .......................................................................................... 4

        D.    Public debate over the strikes' legality.................................................................... 5

        E.    The Department's efforts to shield information about the strikes—
            including the full videos—from public view. ....................................................... 7

    II.    The Times's FOIA requests and this litigation................................................................. 9

LEGAL STANDARD................................................................................................................. 10

ARGUMENT ............................................................................................................................. 11

    I.    The Buria Declaration does not logically and plausibly support withholding the
        footage. .................................................................................................................... 13

    II.    Evidence from the public record indicates that the footage was impermissibly
        withheld to conceal violations of law or avoid embarrassment.................................. 16

    III.    The Department's release of clips depicting the strikes is an official disclosure
        that waives its claim that the remaining footage is secret. ......................................... 18

    IV.    At a minimum, clips from the videos depicting key events before and after the
        strikes are segregable and must be released. .............................................................. 20

CONCLUSION........................................................................................................................... 22

# TABLE OF AUTHORITIES

**Cases**                                                                                          **Page(s)**

*ACLU Immigrants' Rights Project v. ICE*,
  58 F.4th 643 (2d Cir. 2023) ...................................................................................................11

*ACLU v. DOD*,
  389 F. Supp. 2d 547 (S.D.N.Y. 2005)...............................................................................16, 17

*ACLU v. DOD*,
  901 F.3d 125 (2d Cir. 2018)...............................................................................................13

*ACLU v. DOJ*,
  681 F.3d 61 (2d Cir. 2012)..................................................................................................13

*ACLU v. FBI*,
  429 F. Supp. 2d 179 (D.D.C. 2006) ...................................................................................22

*ACLU v. Office of the Director of National Intelligence*,
  2011 WL 5563520 (S.D.N.Y. Nov. 15, 2011)....................................................................13

*ACLU v. Office of the Director of National Intelligence*,
  2012 WL 1117114 (S.D.N.Y. Mar. 30, 2012) ...................................................................16

*Bloomberg, L.P. v. Board of Governors of the Federal Reserve System*,
  601 F.3d 143 (2d Cir. 2010)...........................................................................................10, 11

*CNN, Inc. v. FBI*,
  384 F. Supp. 3d 20 (D.D.C. 2019) ................................................................................13, 21

*El Badrawi v. DHS*,
  583 F. Supp. 2d 285 (D. Conn. 2008)................................................................................14

*Florez v. CIA*,
  829 F.3d 178 (2d Cir. 2016)................................................................................................11

*International Counsel Bureau v. DOD*,
  864 F. Supp. 2d 101 (D.D.C. 2012)...................................................................................21

*Judicial Watch, Inc. v. DOD*,
  857 F. Supp. 2d 44 (D.D.C. 2012).....................................................................................15

*Knight First Amendment Institute v. CDC*,
  560 F. Supp. 3d 810 (S.D.N.Y. 2021)................................................................................11

*N.Y. Times Co. v. DOJ*,
  2016 WL 5946711 (S.D.N.Y. Aug. 18, 2016)....................................................................16

*N.Y. Times Co. v. DOJ*,
   756 F.3d 100 (2d Cir. 2014)......................................................................................19

*N.Y. Times Co. v. FBI*,
   2024 WL 325273 (S.D.N.Y. Jan. 29, 2024) ...............................................................2

*N.Y. Times Co. v. NSA*,
   205 F. Supp. 3d 374 (S.D.N.Y. 2016)........................................................................12

*National Council of La Raza v. DOJ*,
   411 F.3d 350 (2d Cir. 2005)......................................................................................10

*National Day Laborer Organization Network v. ICE*,
   486 F. Supp. 3d 669 (S.D.N.Y. 2020)........................................................................11

*National Immigration Project of the National Lawyers Guild v. DHS*,
   842 F. Supp. 2d 720 (S.D.N.Y. 2012)..................................................................20, 21

*Osen LLC v. United States Central Command*,
   969 F.3d 102 (2d Cir. 2020)...........................................................................17, 18, 19

*Ray v. Turner*,
   587 F.2d 1187 (D.C. Cir. 1978) ................................................................................22

*Rosenberg v. DOD*,
   342 F. Supp. 3d 62 (D.D.C. 2018) ............................................................................15

*Wilner v. NSA*,
   592 F.3d 60 (2d Cir. 2009)........................................................................................11

*Wilson v. CIA*,
   586 F.3d 171 (2d Cir. 2009)......................................................................................19

**Statutes**

5 U.S.C. § 552.............................................................................................10, 11, 12, 20

**Other Authorities**

171 Cong. Rec. S8490-91 (2025) ...................................................................................8

171 Cong. Rec. S8606-10 (2025) ...................................................................................8

Executive Order 13,526, 75 Fed. Reg. 707 (Dec. 29, 2009)....................................12, 17

Plaintiffs The New York Times Company and Charlie Savage (together, "The Times") respectfully submit this memorandum of law in support of their cross-motion for summary judgment and in opposition to the Department of Defense's (the "Department") motion for summary judgment.

## PRELIMINARY STATEMENT

Beginning in September 2025 and continuing to this day, the U.S. military has carried out dozens of lethal strikes on boats in the Caribbean Sea and Pacific Ocean. This case is about three videos depicting some of those strikes. Within days, the President or Secretary of Defense released edited clips from each, showing the moments of initial impact. But the Department has withheld the rest of the footage from The Times. That footage, according to subsequent reporting, reveals critical context missing from the clips: that one of the boats turned away from the United States before it was hit, that two stranded survivors from one strike were killed in a follow-on strike, and that a survivor of another strike was left to drown in the open ocean. The ranking member of the House Intelligence Committee described the video of the follow-on strike as "one of the most disturbing things I've ever seen in my public service."

The Department's brief sidesteps all this. In its telling, this is a straightforward case: the remaining footage was properly classified to protect military tactics and systems, so may be withheld under FOIA exemption 1. But the record points to the opposite conclusion: that the Department—having immediately released the portions of the footage that it considers flattering— has undertaken an outcome-driven classification process to shield the rest of the videos from public view. The Department pins its case on a vague and implausible declaration that fails to meet even the deferential exemption 1 standard. It ignores evidence in the public record that undercuts its version of events and suggests the videos were impermissibly classified to conceal violations of law or to avoid embarrassing the government. It brushes aside the inconvenient fact that it already

1

published truncated but substantially similar footage on social media. And it never explains why, at the very least, portions of the videos showing critical moments before and after the strikes could not be disclosed. The Court should grant The Times's motion, deny the Department's, and order the footage or key portions of it released.

## BACKGROUND

### I.    The boat strikes.

Over the past ten months, the Department has conducted a campaign of military strikes on boats off the coast of Latin America. It says that these strikes target vessels smuggling drugs to the United States but has produced no evidence to support those claims.[1] The strikes—the latest of which took place on June 21—have killed more than 200 people.[2] They have upended the lives of fishermen in Colombia and Ecuador, who fear being targeted.[3] They are also, according to many experts, illegal.[4] At issue here are five of the earliest strikes in the campaign.

### A.    The September 2 strike.

On September 2, 2025, the Department conducted the first boat strike in the campaign, killing eleven people.[5] President Trump announced the strike in a post on his social media platform, Truth Social.[6] In that post, he wrote that the strike targeted "positively identified Tren

---

[1] Simon Romero, *Blowing Up Boats Hasn't Slowed Cocaine Traffic to U.S., Experts Say*, N.Y. Times (May 29, 2026), https://www.nytimes.com/2026/05/29/world/americas/us-boat-strikes-cocaine-trump-south-america.html. The Court may "take[] judicial notice of the content of public reporting and disclosures . . . for the fact of their existence[.]" *N.Y. Times Co. v. FBI*, No. 22-CV-3590 (JPO), 2024 WL 325273, at *4 n.1 (S.D.N.Y. Jan. 29, 2024).

[2] Lazaro Gamio, Carol Rosenberg & Charlie Savage, *Tracking U.S. Military Killings in Boat Attacks*, N.Y. Times (July 1, 2026), https://www.nytimes.com/interactive/2025/10/29/us/us-caribbean-pacific-boat-strikes.html.

[3] Max Bearak & José María León Cabrera, *The U.S. Boat Strike Campaign Has Now Killed Over 200 People*, N.Y. Times (May 31, 2026), https://www.nytimes.com/2026/05/31/world/americas/us-boat-strikes-colombia-ecuador.html.

[4] Charlie Savage & Julian E. Barnes, *Second Strike Scrutiny Obscures Larger Question About Trump's Boat Attacks*, N.Y. Times (Dec. 4, 2025), https://www.nytimes.com/2025/12/04/us/politics/trump-boat-attacks-killings.html (hereinafter "*Larger Questions About Trump's Boat Attacks*").

[5] Helene Cooper, Eric Schmitt, Edward Wong & Alan Feuer, *Trump Says U.S. Attacked Boat Carrying Venezuelan Gang Members, Killing 11*, N.Y. Times (Sept. 2, 2025), https://www.nytimes.com/2025/09/02/us/politics/trump-venezuela-boat-drugs-attack.html.

[6] Donald J. Trump (@realDonaldTrump), Truth Social (Sept. 2, 2025, 5:22 PM), https://truthsocial.com/@realDonaldTrump/posts/115136798909755892.

2

de Aragua Narcoterrorists" who were "transporting illegal narcotics, heading to the United States."[7] The post also included twenty-nine seconds of surveillance video from multiple angles and degrees of magnification depicting the moment of impact.[8]

In the days following the strike, however, additional details emerged that undercut this narrative. First, officials briefed on the fuller surveillance video revealed that the boat had turned away from the United States before the strike.[9] And second, officials disclosed that the initial strike left two survivors, who were killed in a follow-on strike.[10] (The White House later confirmed that this follow-on strike took place.[11]) The video of the follow-on strike was eventually shown to some members of Congress, and people who saw it described how the "survivors, shirtless, clung to the hull [of the boat], tried unsuccessfully to flip it back over, then climbed on it and slipped off into the water, over and over" before they were killed.[12] The two men are also said to have waved at something overhead, likely the military aircraft that had attacked their boat.[13]

B. *The October 16 strike.*

On October 16, the Department conducted another strike on a boat in the Caribbean, killing two people and leaving behind two survivors.[14] President Trump announced the strike on Truth

---

[7] *Id.*

[8] *Id.*

[9] Charlie Savage & Helene Cooper, *Boat Suspected of Smuggling Drugs Is Said to Have Turned Before U.S. Attacked It*, N.Y. Times (Sept. 10, 2025), https://www.nytimes.com/2025/09/10/us/trump-drug-boat-venezuela-strike.html (hereinafter "*Boat Is Said to Have Turned*").

[10] Julian E. Barnes & Charlie Savage, *Video of Boat Strike Shows Survivors Waving Before Fatal Follow-Up Attack*, N.Y. Times (Dec. 5, 2025), https://www.nytimes.com/2025/12/05/us/politics/boat-strike-shows-survivors.html (hereinafter "*Video of Boat Strike Shows Survivors Waving*").

[11] Rebecca Shabad & Gabe Gutierrez, *White House Confirms Sept. 2 Second Strike on Drug Boat*, NBC News (Dec. 1, 2025), https://www.nbcnews.com/politics/white-house/white-house-confirms-second-sept-2-strike-alleged-drug-boat-rcna246834.

[12] Helene Cooper, Megan Mineiro, Julian E. Barnes & Charlie Savage, *An Explosion, Then Survivors: Military Officers Show Lawmakers Video of Sept. 2 Boat Attack*, N.Y. Times (Dec. 4, 2025), https://www.nytimes.com/2025/12/04/us/politics/drug-boat-strikes-sept-2-video-congress.html.

[13] *Video of Boat Strike Shows Survivors Waving*.

[14] Colombia and Ecuador. *See* Eric Schmitt, Charlie Savage & Carol Rosenberg, *U.S. Is Repatriating Survivors of Its Strike on Suspected Drug Vessel*, N.Y. Times (Oct. 18, 2025), https://www.nytimes.com/2025/10/18/politics/boat-strike-survivors.html.

3

Social two days later, writing that "[t]here were four known narcoterrorists on board the vessel" and that "[t]he two surviving terrorists are being returned to their Countries of origin, Ecuador and Colombia, for detention and prosecution."[15] (Department lawyers discussed other options before deciding to repatriate the survivors: according to subsequent reporting, the goal of these deliberations was to keep the survivors out of the American legal system to avoid judicial review of the strikes.[16]) The post again included twenty-nine seconds of surveillance video from multiple angles depicting the moment of impact.[17]

### C.  The October 27 strikes.

On October 27, the Department conducted a series of three strikes on boats in the eastern Pacific Ocean, killing fifteen people.[18] Fourteen of those people were killed in the initial strikes.[19] The following day, Secretary of Defense Pete Hegseth announced the strikes in a post on the social media platform X, writing that the boats were "operated by Designated Terrorist Organizations . . . trafficking narcotics."[20] The post again included twenty-eight seconds of surveillance video depicting the moments of initial impact from multiple airborne camera angles, some black-and-white and some in color.[21]

The fifteenth person initially survived the strike, and Secretary Hegseth's post claimed that military officials "immediately initiated" search and rescue protocols before passing off the

---

[15] Donald J. Trump (@realDonaldTrump), Truth Social (Oct. 18, 2025, 2:41 PM), https://truthsocial.com/@realDonaldTrump/posts/115396632441470075 (hereinafter "*October 18 Truth Social Post*").

[16] Damien Cave, Edward Wong & Maria Abi-Habib, *Inside the Pentagon's Scramble to Deal With Boat Strike Survivors*, N.Y. Times (Dec. 9, 2025), https://www.nytimes.com/2025/12/09/us/politics/pentagon-boat-strike-survivors.html (hereinafter "*Pentagon's Scramble to Deal With Boat Strike Survivors*").

[17] *October 18 Truth Social Post.*

[18] Helene Cooper & Eric Schmitt, *U.S. Military Kills 14 More People Accused of Smuggling Drugs on Boats*, N.Y. Times (Oct. 28, 2025), https://www.nytimes.com/2025/10/28/us/politics/us-military-boat-strikes.html?smid=url-share.

[19] *Id.*

[20] Secretary of War Pete Hegseth (@SecWar), X (Oct. 28, 2025, 9:30 AM), https://x.com/SecWar/status/1983164355999883548.

[21] *Id.*

operation to the Mexican military, which "assumed responsibility for coordinating the rescue."[22] But the Mexican government later said it was unable to locate that person, who is presumed to have drowned.[23] It remains unclear why the U.S. military could not pick up the survivor, as it did after the October 16 strike.

### D.  Public debate over the strikes' legality.

In public, the executive branch has offered shifting legal justifications in support of the campaign. After the September 2 strike, President Trump sent Congress a letter stating that he had ordered the attack as a matter of "self-defense."[24] Later that month, the administration sent an unsigned notice to Congress that offered a different reason: that the President had "determined" that the United States was in a formal state of non-international armed conflict with what it called "designated terrorist organizations."[25]

These fluid rationales, along with the publicly known facts about the strikes themselves, have touched off an ongoing and vigorous debate about the legality of the campaign. On one side of that debate is the Department, which asserts that it has done nothing wrong. On the other are a wide range of observers—including legal scholars, former military lawyers, and members of Congress— who have concluded that the strikes are illegal.[26] A few examples illustrate the breadth

---

[22] *Id.*

[23] Jack Nicas & Helene Cooper, *Mexico Winds Down Search for Survivor of U.S. Boat Strike*, N.Y. Times (Oct. 31, 2025), https://www.nytimes.com/2025/10/31/us/politics/us-boat-strike-survivor.html.

[24] Letter from President Trump to Congress (Sept. 4, 2025), https://static01.nyt.com/newsgraphics/documenttools/8616481a85b02a2c/b05f64ca-full.pdf; *see also* Tyler McBride, *Trump Offers First Legal Justification for Venezuela Boat Strike*, Lawfare (Sept. 5, 2025), https://www.lawfaremedia.org/article/trump-offers-first-legal-justification-for-venezuela-boat-strike.

[25] Unsigned Notice to Congress, https://static01.nyt.com/newsgraphics/documenttools/ed9a9b14a6fde33b/3ce6c48b-full.pdf; *see also* Charlie Savage & Eric Schmitt, *Trump 'Determined' the U.S. Is Now in a War with Drug Cartels, Congress Is Told*, N.Y. Times (Oct. 2, 2025), https://www.nytimes.com/2025/10/02/us/politics/trump-drug-cartels-war.html.

[26] *Pentagon's Scramble to Deal With Boat Strike Survivors* ("[M]any legal experts say the campaign amounts to the summary execution of civilians."); Carol Rosenberg, *Pentagon's Boat Bombings Are Illegal, Human Rights Panel Is Told*, N.Y. Times (March 13, 2026), https://www.nytimes.com/2026/03/13/us/politics/pentagon-boat-bombings.html ("Experts in international and U.S. domestic law told an inter-American human rights organization on Friday that the

of this near-consensus. Marty Lederman, a law professor and former Department of Justice official, called the strikes "so manifestly unlawful that in any other administration, including Trump's first, if anyone had even dared to propose it, virtually any and every attorney who got wind of it . . . would have immediately dismissed it as obviously out-of-bounds."[27] Geoffrey S. Corn, the Army's former senior advisor for law-of-war issues, explained that the campaign rests on "the dubious and legally overbroad assertion that the United States is justified in using wartime authority against a criminal problem."[28] Rebecca Ingber, a law professor and former State Department expert in the law of war, opined that "the entire boat-strikes campaign is murder, full stop."[29] They are not alone: as The Times reported, "[i]t is difficult to find people knowledgeable about the relevant body of law and not working for Mr. Trump who think the United States is really in an armed conflict."[30]

Not only those outside the military reached this conclusion. The most senior lawyer within United States Southern Command ("SOUTHCOM"), the Department component overseeing the campaign, reportedly raised concerns about the strikes but was overruled by other officials.[31] And

Pentagon's campaign of blowing up boats it suspected of smuggling drugs in the Pacific Ocean and the Caribbean was illegal.").

[27] Marty Lederman, *The Many Ways in Which the September 2 Caribbean Strike was Unlawful … and the Grave Line the Military Has Crossed*, Just Security (Sept. 10, 2025), https://www.justsecurity.org/120296/many-ways-caribbean-strike-unlawful.

[28] *Larger Questions About Trump's Boat Attacks*; *see also* Geoffrey Corn, *A Dangerous Precedent: What Happens If Military Lawyers Go Silent*, Cipher Br. (Sept. 8, 2025), https://www.thecipherbrief.com/a-dangerous-precedent-what-happens-when-military-lawyers-go-silent (discussing "what appears to be the abandonment of the rule of law from the very top of our national chain of command").

[29] *Larger Questions About Trump's Boat Attacks*.

[30] *Id.*

[31] Gordon Lubold, Courtney Kube & Dan De Luce, *Top Military Lawyer Raised Legal Concerns About Boat Strikes*, NBC News (Nov. 19, 2025), https://www.nbcnews.com/politics/national-security/top-military-lawyer-raised-legal-concerns-boat-strikes-rcna243694.

SOUTHCOM's commanding officer stepped down a month into the campaign, apparently after expressing similar reservations.[32]

Many observers have focused on the September 2 strike and follow-on strike. Some have noted that the apparent decision by the people on the boat to turn around before the strike undercuts even the Department's asserted legal theory, that the boat could be targeted because it was imminently attacking the United States.[33] And the follow-on strike on the shipwrecked survivors has been described as "clearly unlawful" (Michael Schmitt, a former Air Force lawyer and professor emeritus at the U.S. Naval War College),[34] "murder on the high seas" (Brian Finucane, a former State Department lawyer),[35] and "one of the most disturbing things I've ever seen in my public service" (Rep. Jim Himes, ranking member of the House Intelligence Committee).[36]

E. *The Department's efforts to shield information about the strikes—including the full videos—from public view.*

In the face of this criticism, the Department has worked to withhold information about the strikes from Congress and the public. After President Trump initially expressed willingness to release the full videos, he backtracked and claimed that it was the Department's decision.[37] The Department then showed the video of the September 2 follow-on strike to select members of

---

[32] Eric Schmitt & Tyler Pager, *Head of the U.S. Military's Southern Command Is Stepping Down, Officials Say*, N.Y. Times (Oct. 16, 2025), https://www.nytimes.com/2025/10/16/us/politics/southern-command-head-stepping-down.html.

[33] *Boat Is Said to Have Turned* ("'If someone is retreating, where's the "imminent threat" then?' said Rear Adm. Donald J. Guter, a retired top judge advocate general for the Navy from 2000 to 2002. 'Where's the "self-defense"? They are gone if they ever existed — which I don't think they did.'").

[34] Ben Finley & Konstantin Toropin, *Experts Explain What the Law Says About Killing Survivors of a Boat Strike*, AP (Dec. 1, 2025), https://apnews.com/article/boat-strikes-survivors-hegseth-72b0a498ca08615b2589c772a1d9e642.

[35] *Id.*

[36] Joe Gould, Connor O'Brien & John Sakellariadis, *Lawmakers Sharply Divided as Congress Probes Killings at Sea*, Politico (Dec. 4, 2025), https://www.politico.com/news/2025/12/04/boat-strike-one-of-the-most-disturbing-things-ive-ever-seen-00676949.

[37] David E. Sanger, *Trump Backtracks on Releasing Video of Boat Strike*, N.Y. Times (Dec. 8, 2025), https://www.nytimes.com/2025/12/08/us/politics/trump-boat-strike-video-hegseth.html.

Congress, but declined to release it to additional lawmakers or the public.[38] The government has also declined to release the secret legal memo purportedly justifying the strikes, which is the subject of a separate FOIA action in this Court. *ACLU v. DOJ*, No. 25-cv-10189 (S.D.N.Y., filed Dec. 9, 2025). It has likewise refused to release the orders authorizing the strikes and any applicable rules of engagement.[39] And it has strategized to avoid transporting strike survivors to the United States, where they could challenge their treatment in court.[40]

One way to interpret the secrecy around the strikes is as a means to short-circuit the public debate about their legality. As Senator Chris Van Hollen explained, "If [President] Trump has nothing to hide here, he should provide the full videos to the Congress and to the American people."[41] And this secrecy contrasts sharply with the treatment of the video clips posted by President Trump and Secretary Hegseth.[42] Because the released clips are incomplete, in other words, the additional footage is critical to understanding whether the Department's position is legally sound.

---

[38] Robert Jimison & Megan Mineiro, *Hegseth Declines to Show Lawmakers Boat Strike Video*, N.Y. Times (Dec. 16, 2026), https://www.nytimes.com/2025/12/16/us/politics/hegseth-congress-boat-strike-video.html.

[39] Helene Cooper, Julian E. Barnes, Charlie Savage & Eric Schmitt, *U.S. Military's Boat Strikes Planning Takes on New Significance*, N.Y. Times (Dec. 3, 2025), https://www.nytimes.com/2025/12/03/us/politics/trump-boat-strikes-survivors.html ("Several congressional officials said lawmakers had asked to review logs related to the operation, along with written documentation like Mr. Hegseth's 'execute order' and the rules of engagement. It is not clear whether the Pentagon will turn them over.").

[40] *Pentagon's Scramble to Deal With Boat Strike Survivors*.

[41] 171 Cong. Rec. S8606-10, 8609 (2025) (statement of Sen. Chris Van Hollen); *see also* 171 Cong. Rec. S8490-91, 8491 (2025) (statement of Sen. Jack Reed) ("[T]he Pentagon must declassify and publish the full, unedited video of the September 2 strike. If they followed the laws of war, it will be clear for all of us to see. If they have nothing to hide, transparency would be welcomed and obvious. The American people deserve to see what is being done in their name, and I can only say their reluctance to do so suggests that they are reluctant for a reason. These films could be highly incriminating. The American people deserve to see them.").

[42] 171 Cong. Rec. S8606-10, 8608 (2025) (statement of Sen. Tim Kaine) ("The President has said that video could be available to all. Indeed, the President has made the video of the strike available on his social media account, bragging about it, patting himself on the back about it, but now that we are asking for the full video--not just the first strike but the second strike as well where survivors were slaughtered--suddenly, the Secretary of Defense is walking it back and saying: We need to protect our sources and methods. You need to protect your sources and methods when you have been turning it into a TV commercial, a social media commercial showing the world about what a tough guy you are. If you are a tough guy and you think you are proud of this, then let the American people see the entire video.").

**II.    The Times's FOIA requests and this litigation.**

The Times submitted two FOIA requests for complete footage of the strikes at issue. The first request, filed on September 9, 2025, sought "a copy of surveillance video related to the operation in the Caribbean Sea on or about Sept. 2, 2025, in which the U.S. military attacked a boat that President Trump said was carrying drugs and 11 members of Tren de Aragua."[43] The second, filed on November 1, 2025, asked for "the entire videos from each available source for the two strikes to date in which the administration said there were survivors: the strike on a semi-submersible Trump announced on Truth Social on . . . October 18, and one of the trio of strikes Hegseth announced on X on Oct. 28."[44] SOUTHCOM, a component of the Department, acknowledged both requests.[45]

Because the Department failed to respond to The Times's requests within FOIA's statutory deadlines, The Times filed suit on November 10, 2025. ECF No. 1. In the months since, the Department has repeatedly sought to delay the case and avoid responding to The Times's requests. *See, e.g.*, ECF No. 8 (requesting an extension); ECF No. 11 (same); ECF No. 13 (same); *see also* ECF No. 32 ("Gov't Br.") at 6 (conceding that "the government required significant time to process plaintiffs' FOIA requests"). In March 2026, after The Times raised concerns about the Department's timeline for processing the requests and deciding whether to release the requested footage, ECF No. 16, the Department responded that it needed until April 30, 2026 to make its determination, ECF No. 18. The Court blessed this timeline but noted that it "fully expects

---

[43] McCraw Decl. Ex. 1. The request specified that responsive records would include "the entire video from each available source, starting one hour before the strike or strikes and continuing for one hour after the strike or strikes." *Id.*

[44] McCraw Decl. Ex. 2. The request specified that responsive records would include "the entirety of footage showing survivors—including the rescue of two survivors from the earlier strike, and footage extending at least five minutes past any disappearance below the waves of the one who initially survived the second strike—even if that period extends past one hour following the strikes." *Id.* It also renewed the request for footage from the September 2 strike. *Id.*

[45] McCraw Decl. Exs. 3, 4.

Defendant to comply by the April 30th deadline." ECF No. 20 at 2. But the Department failed to comply, disclosing in a status report that it had not even transferred the responsive videos to SOUTHCOM until two days before the deadline. ECF No. 21 at 1-2. The Court gave the Department an extra week, until May 7, but stated that it "will not consider additional extension requests absent extraordinary circumstances and may consider sanctions if Defendant does not comply with the May 7th deadline." ECF No. 22 at 1. After initially seeking The Times's consent for a further extension (which The Times declined to provide), the Department conveyed its determination in an email to The Times on the evening of May 7: that it "[is] not making any further release of the requested videos."[46]

But that was not the end of the matter. After initially representing to The Times that its formal determination letter was forthcoming, the Department declined to provide it for weeks. ECF No. 27. The Court, once more, had to step in, ordering the Department to produce its letter by June 5. ECF No. 28 at 1. On June 3, the Department conveyed its letter, which stated that the videos were being withheld in full under FOIA exemption 1.[47] The parties now cross-move for summary judgment.

## LEGAL STANDARD

FOIA requires that government records be made available to the public unless a statutory exemption applies. 5 U.S.C. § 552(a)(3)(A), (b)(1)–(9). "The basic purpose of FOIA reflect[s] a general philosophy of full agency disclosure . . . ." *Bloomberg, L.P. v. Bd. of Governors of the Fed. Reserve Sys.*, 601 F.3d 143, 147 (2d Cir. 2010) (cleaned up). The agency always "bears the burden of demonstrating that any claimed exemption applies." *Nat'l Council of La Raza v. DOJ*, 411 F.3d 350, 356 (2d Cir. 2005); *see* 5 U.S.C. § 552(a)(4)(B). To effectuate FOIA's "general

---

[46] McCraw Decl. Ex. 5.
[47] McCraw Decl. Ex. 6.

principle of broad disclosure," exemptions must be "given a narrow compass," and "all doubts as to the applicability of the exemption must be resolved in favor of disclosure." *Florez v. CIA*, 829 F.3d 178, 182 (2d Cir. 2016).

A court reviews de novo an agency's decision to withhold information from the public. *See* 5 U.S.C. § 552(a)(4)(B). The agency's decision is entitled to no judicial deference. *Bloomberg*, 601 F.3d at 147. The Government is not entitled to summary judgment unless its filings "describe the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption, and are not controverted by either contrary evidence in the record or by evidence of agency bad faith." *ACLU Immigrants' Rts. Project v. ICE*, 58 F.4th 643, 651 (2d Cir. 2023). "Ultimately, an agency's justification for invoking a FOIA exemption is sufficient if it appears logical or plausible." *Wilner v. NSA*, 592 F.3d 60, 73 (2d Cir. 2009) (cleaned up).

Although courts review reasonably detailed agency affidavits with a presumption of good faith, "conclusory affidavits that merely recite statutory standards, or are overly vague or sweeping will not carry the Government's burden." *Nat'l Day Laborer Org. Network v. ICE*, 486 F. Supp. 3d 669, 689 (S.D.N.Y. 2020) (cleaned up). In contrast, "summary judgment in favor of the FOIA plaintiff is appropriate when an agency seeks to protect material which, even on the agency's version of the facts, falls outside the proffered exemption." *Knight First Amend. Inst. v. CDC*, 560 F. Supp. 3d 810, 820 (S.D.N.Y. 2021).

## **ARGUMENT**

FOIA exemption 1 allows agencies to withhold records if they are (1) "specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy" and (2) "are in fact properly classified pursuant to such

Executive order." 5 U.S.C. § 552(b)(1). "FOIA Exemption 1 is, like the other exemptions, to be construed narrowly." *N.Y. Times Co. v. NSA*, 205 F. Supp. 3d 374, 381 (S.D.N.Y. 2016).

The executive order governing classification is Executive Order 13,526, 75 Fed. Reg. 707 (Dec. 29, 2009). That order sets out the classification process and the categories of information that may properly be classified. Those categories include, as relevant here, "military plans, weapons systems, or operations" and "vulnerabilities or capabilities of systems, installations, infrastructures, projects, plans, or protection services relating to the national security." *Id.* § 1.4(a), (g). But information falling within these categories may be classified only if "its unauthorized disclosure could reasonably be expected to cause identifiable or describable damage to the national security." *Id.* § 1.4. The order also includes a list of *im*permissible reasons for classifying information: "[i]n no case shall information be classified, continue to be maintained as classified, or fail to be declassified" to, among other purposes, "conceal violations of law, inefficiency, or administrative error" or "prevent embarrassment to a person, organization, or agency." *Id.* § 1.7(a).

In this case, the Department claims that the videos are properly classified because they would damage national security by revealing information about the U.S. military's operational capabilities. Though it has already published clips from each of the videos, it urges this court to rubber-stamp its claim that *not one second more* can be released without causing this harm. But its declaration fails to logically and plausibly support those assertions. Instead, the record reveals that the full videos were classified for the impermissible purposes of concealing violations of law and preventing embarrassment. And the Department's selective release of clips from the strikes waives its claim that the rest of the footage must be kept secret. Finally, even if the Department has shown that release of the full videos would damage national security, it has failed to demonstrate that

12

release of short, segregable clips depicting critical moments before and after the strikes would cause the same harm. The videos—or those key portions of them—should be released.

## I.     The Buria Declaration does not logically and plausibly support withholding the footage.

To carry its burden, the Department relies entirely on a declaration from Ricky D. Buria, the Chief of Staff to Secretary Hegseth. ECF No. 31 ("Buria Decl."). So the Buria Declaration must logically and plausibly show that the withheld videos fall within at least one of the executive order's categories and that their release would cause some identifiable harm to national security. It fails to carry this burden.

It is no doubt true that declarations in exemption 1 cases are ordinarily afforded significant judicial deference. *ACLU v. DOJ*, 681 F.3d 61, 70 (2d Cir. 2012). But "deference is not equivalent to acquiescence, and the Court must not relinquish its independent responsibility to review agency determinations de novo[.]" *ACLU v. Office of the Dir. of Nat'l Intelligence*, 2011 WL 5563520, at *5 (S.D.N.Y. Nov. 15, 2011) (cleaned up). Indeed, this "[d]eference to the executive's national security and military judgments is appropriate only where [the Court] ha[s] sufficient information to evaluate whether those judgments were logical and plausible." *ACLU v. DOD*, 901 F.3d 125, 134 (2d Cir. 2018).

Even under this deferential standard, the Buria Declaration falls short. It is rife with speculative phrasing: the word "could" appears in nearly every sentence claiming that release would harm national security. *See* Buria Decl. ¶¶ 8-9. More importantly, its assertions are vague and conclusory. *CNN, Inc. v. FBI*, 384 F. Supp. 3d 20, 38 (D.D.C. 2019) ("Conclusory and sweeping generalizations will not suffice."), *vacated in part on other grounds*, 984 F.3d 114 (D.C. Cir. 2021); *see also Office of the Dir. of Nat'l Intelligence*, 2011 WL 5563520, at *6 ("By proffering conclusory and nearly identical justifications for the various . . . withholdings, the

13

government appears to assume that de novo FOIA review requires little more than a judicial spell check."). The crux of the declaration is that the videos "reveal[] specific operational and targeting capabilities of U.S. military forces." Buria Decl. ¶ 8; *see also id.* ¶ 9 ("[T]his information reveals specific operational capabilities of U.S. military forces."). This is military boilerplate.

The declaration's meager elaboration on this basic idea does not help. It claims that "adversaries could use this information to assess specific U.S. military tactics and procedures, which would allow them to develop countermeasures or modify their behavior to render ongoing U.S. military operations less effective." Buria Decl. ¶ 8. But what "specific" tactics and procedures would be exposed? And what information in the additional footage at issue would expose them? It alleges that the videos "could reveal information about the effectiveness of munitions." *Id.* But how, especially where clips of the strikes themselves have already been released? *Cf. El Badrawi v. DHS*, 583 F. Supp. 2d 285, 314 (D. Conn. 2008) (rejecting as "conclusory" an affidavit claiming that "release of this information would hinder the ability to obtain such information in the future and damage relations with the government concerned" without explaining how), *abrogated on other grounds by Spadaro v. CBP*, 978 F.3d 34 (2d Cir. 2020). And, in a similar vein, it says that the videos could allow adversaries to "potentially identify specific assets involved with ongoing operations, assess their specific capabilities and limitations, and develop countermeasures or modify their behavior to nullify these systems and place U.S. personnel at risk." Buria Decl. ¶ 9. Again, though, how could aerial surveillance videos help adversaries identify specific assets, let alone assess their limitations and develop countermeasures, beyond what was already revealed by the previously released clips? Perhaps recognizing this problem, this paragraph uses the words "potential" or "potentially" three times. *Id.*

14

These claims are simply too vague to permit meaningful judicial review of whether the Department's decision meets the executive order's standards. Unlike cases where "each declarant expounds his evaluation of the national-security risk in detail, describing the basis for his beliefs and focusing on those risks that relate to his area of expertise," *Judicial Watch, Inc. v. DOD*, 857 F. Supp. 2d 44, 61 (D.D.C. 2012), the declaration maintains a 30,000-foot view. For all its military jargon, it never establishes the "logical connection between the disclosure of" the responsive records "and a risk to the national security" required to justify withholding under exemption 1. *Rosenberg v. DOD*, 342 F. Supp. 3d 62, 86 (D.D.C. 2018).

In addition, the declaration's claims are significantly undermined by the Department's release of clips from each of the strikes. As discussed above, the main point of the declaration is that the full videos could "reveal[] specific operational and targeting capabilities of U.S. military forces," Buria Decl. ¶ 8, including the "optical tools utilized, and their limitations" and "elevation, speed, range, and other operationally sensitive information," *id.* ¶ 6. But the already-released clips show the doomed boats from several angles along with the moments of impact. In other words, they reveal both what multiple aerial surveillance cameras can see and the effects of the munitions used in the operations. So while the additional footage would provide important visual confirmation of the Department's conduct, it is unlikely to reveal new information about the government's surveillance and targeting capabilities. Yet the Department asks the Court to take its word that it released exactly as much of the footage "as was assessed to be safely possible," and that release of even one more second of footage would damage national security. Buria Decl. ¶ 6. Whatever "logical and plausible" means, these assertions miss the mark.

The Department does nothing more to meet its burden. Its brief largely parrots the Buria Declaration's averments. Gov't Br. at 5-7. For good measure, it tacks on cases supporting the

general proposition that courts have, in the past, upheld exemption 1 withholdings for material related to military operations and surveillance capabilities. *Id.* at 8. That is no surprise. But it has no bearing on whether the Buria Declaration is sufficient to justify withholding here. In the end, the declaration's assertions are so vague, and so undermined by the release of the clips, that they fail to meet even the deferential exemption 1 standard.

## II.    Evidence from the public record indicates that the footage was impermissibly withheld to conceal violations of law or avoid embarrassment.

Even if the Court were to credit the Buria Declaration, evidence in the public record supports the conclusion that the Department withheld the videos "to avoid embarrassment or to conceal violations of law, which . . . are impermissible bases for withholding records" under the executive order and, by extension, FOIA. *ACLU v. Office of the Dir. of Nat'l Intelligence*, 2012 WL 1117114, at *4 (S.D.N.Y. Mar. 30, 2012); *see also N.Y. Times Co. v. DOJ*, 2016 WL 5946711, at *8 (S.D.N.Y. Aug. 18, 2016) ("Information may not be classified for the purpose of concealing wrongdoing.").

The public record reveals the following. *See ACLU v. DOD*, 389 F. Supp. 2d 547, 564-65 (S.D.N.Y. 2005) (explaining that "discussions . . . in the public press . . . raise concern" that the agency was attempting to conceal violations of law or prevent embarrassment). A wide range of legal experts, including former military lawyers who advised the U.S. armed forces on the laws of war and SOUTHCOM's own top lawyer, concluded that the strikes were illegal from the outset. Many of the same experts determined that the September 2 follow-on strike was likewise illegal. Senior government officials selectively released clips from the footage that show the initial strikes themselves but omit additional context, including context that could undermine the Department's own legal theories (the boat allegedly turning around) or create new legal risk (the follow-on strike; the seeming failure to rescue the survivor). Some members of Congress who saw additional

16

footage in classified briefings described it as shocking and called for its release. The President initially agreed to release the full videos publicly but later backtracked. The Department has shielded additional information about the strikes, including the memo laying out their purported legal justification and the orders authorizing them, from the public. And discussions within the government apparently focused on preventing any survivors of the boat strikes—including the survivors of the strikes at issue—from reaching U.S. soil, lest they challenge the strikes in American courts. Taken together, all this raises the plausible inference that the Department, having reached its classification decision amid this intense legal and political scrutiny, decided to classify the additional footage (or keep it classified) to conceal violations of law or avoid embarrassment.

The Department's conduct in this litigation further supports this conclusion. It repeatedly insisted that it needed more time to process the requests despite their narrow scope and its decision to release clips within days of each strike, waited weeks to even transfer the videos to the relevant component, and ultimately required court orders both to make a determination on the requests and, several weeks later, to produce a routine determination letter to The Times. *Cf Osen LLC v. United States Cent. Command*, 969 F.3d 102, 116 (2d Cir. 2020) (attributing good faith to the agency due to its "accommodations during this litigation, as well as its demonstrated willingness to address redactions where [the requester] points to inconsistencies" (cleaned up)).

The Buria Declaration does not meaningfully rebut any of this evidence. Its only comment on the subject is the bare assertion that "[t]he information withheld has not been classified to conceal violations of law, inefficiency, or administrative error; prevent embarrassment to a person, organization, or agency; restrain competition; or prevent or delay the release of information that does not require protection in the interests of national security, per section 1. 7 of E.O. 13526." Buria Decl. ¶ 6. But this is far from sufficient where the public record reveals extensive debate

17

about the legality and propriety of the actions recorded in the footage, *DOD*, 389 F. Supp. 2d at 565 (faulting an agency declaration for failing to explain how information in the records "might constitute a violation of law, or an embarrassment . . . when debate on these points within the administration probably occurred" (cleaned up)), and where the agency's litigation conduct appears designed to stall a resolution of the requests.

**III.    The Department's release of clips depicting the strikes is an official disclosure that waives its claim that the remaining footage is secret.**

As explained above, the release of the clips on social media by the President and Secretary of Defense significantly weakens the Department's claim that it cannot release any more footage without damaging national security and suggests an improper effort to publicize what portions of the video it views as flattering while obscuring the rest. But it also undercuts the Department's position in another way: it serves as an official disclosure that waives any claim that the remaining footage is secret.

The official disclosure doctrine recognizes that the government cannot withhold even properly classified information if it "itself has officially disclosed it" already. *Osen LLC*, 969 F.3d at 109. Information has been officially disclosed if "it (1) is as specific as the information previously released, (2) matches the information previously disclosed, and (3) was made public through an official and documented disclosure." *Id.* (cleaned up).

Here, the President and Secretary of Defense released clips from each of the videos at issue. These clips show the moments of impact, along with brief periods before and after the strikes. They depict these events from multiple angles and levels of magnification. They reveal, in other words, that the U.S. military used lethal force against the boats, and that it tracked those boats from multiple vantage points before, during, and immediately after doing so. The White House later

18

acknowledged that the September 2 follow-on strike, which does not appear in the released footage, took place.

With all this in mind, the third prong of the test is the easiest to resolve. Public releases from the President and the Secretary of Defense unquestionably constitute official and documented disclosures. *Wilson v. CIA*, 586 F.3d 171, 195 (2d Cir. 2009) (noting that a statement from an agency head constitutes an official disclosure); *N.Y. Times Co. v. DOJ*, 756 F.3d 100, 120 (2d Cir. 2014) (treating statements by the President as official disclosures).

That leaves specificity and matching. Though the two prongs often "blend together," each serves a distinct purpose. *Osen LLC*, 969 F.3d at 110. The specificity requirement compares the level of generality (or, put differently, "the quality or kind") of the disclosed and withheld records, while the matching prong examines the "overlap in [their] subject matter." *Id.* at 110-12. Both are met here. The additional footage—"videos . . . track[ing] the targeted vessels before, during, and immediately after the kinetic strikes," Buria Decl. ¶ 3—is at the same level of generality as the already-released clips, which show the same. And the subject matter of both—the strikes, the run-up to them, and their immediate aftermath—likewise overlaps.

The additional footage at issue here would, of course, go beyond what was already released in the clips. But the Second Circuit has explained that the matching requirement does not "require absolute identity," since, after all, "[a] FOIA requester would have little need for undisclosed information if it had to match precisely information previously disclosed." *N.Y. Times Co.*, 756 F.3d at 120.[48] Having chosen to reveal that it struck the boats and that it surveilled them from multiple angles, the Department has waived the claim that any additional footage depicting those same events is secret.

---

[48] In this respect, the Second Circuit has diverged from the D.C. Circuit, which requires something close to absolute identity between the disclosed and withheld information. *Osen LLC*, 969 F.3d at 111 n.6.

**IV.     At a minimum, clips from the videos depicting key events before and after the strikes are segregable and must be released.**

Even if the Buria Declaration logically and plausibly shows that release of the full videos would harm national security, it does not demonstrate that release of short clips from the videos depicting key moments before and after the strikes—for example, when the boat hit by the September 2 strike turned around before the strike, when the survivors of the September 2 strike were killed by the follow-on strike, and when the survivor of the October 27 strikes was last seen above the waves—would cause the same harm.

It is a basic principle of FOIA that an agency must release "any reasonably segregable portion of" the responsive records. 5 U.S.C. § 552(b). So "where agencies claim that non-exempt material is not reasonably segregable from exempt material, they must provide a detailed justification for that claim." *Nat'l Immigration Project of the Nat'l Lawyers Guild v. DHS*, 842 F. Supp. 2d 720, 725 n.5 (S.D.N.Y. 2012) (cleaned up). Here, the three responsive videos "exceed[] ten hours in length" and "track the targeted vessels before, during, and *immediately after* the kinetic strikes." Buria Decl. ¶ 3 (emphasis added). This phrasing suggests that the bulk of the footage shows the boats in the hours before the strikes, and that the footage of the key moments referenced above—all of which happened right before or after the strikes—would be a short portion of the overall footage and easily segregable.

Nonetheless, the Department claims that the Buria Declaration "explains" how no additional clips from the videos can be segregated and released. Gov't Br. at 7. "Asserts" might be a better verb. The declaration's main comment on segregability is the unsupported claim that "[Mr. Buria] conclude[s] that no reasonable segregation and release of non-exempt information is possible beyond what is already in the public domain." Buria Decl. ¶ 13. And much of its explanation for withholding the footage focuses on the harm that could arise from release of the

20

*full-length* videos. Buria Decl. ¶ 6 ("If provided the full-length videos, a sophisticated adversary could . . . ."); *id.* ("[A] study of the full-length videos provides insight . . . ."); *id.* ¶ 11 ("[T]he release of those segments [already posted by the President and Secretary of Defense on social media] alongside the full-length videos could reveal classified information that is inextricably intertwined with the overall video display."). This explanation simply does not apply to the select portions discussed here.

Nor has the Department advanced any other "detailed justification." *Nat'l Immigration Project of the Nat'l Lawyers Guild*, 842 F. Supp. 2d at 725 n.5. The best it can manage is that "releasing more footage than the previously cleared short clips would give damaging insight into current imaging capabilities and military strike precision." Buria Decl. ¶ 12. Precisely how is left unexplained. As for footage of the follow-on strike, the Department points to the "unique considerations with such events including, but not limited to, the potential to disclose the effectiveness of munitions, damage assessments, and U.S. military decision-making relating to follow-up actions." *Id.* But this oblique phrasing—that follow-on strikes as a general matter raise "unique considerations"—fails to link the specific footage at issue to any national security harm. *See CNN, Inc.*, 384 F. Supp. 3d at 38 (rejecting "abstract and conclusory statements about national security untethered to the specific information withheld").

To the extent the Court has any doubt about which portions of the videos may be reasonably segregable, it should review the footage *in camera*. *Int'l Counsel Bureau v. DOD*, 864 F. Supp. 2d 101, 106-07 (D.D.C. 2012) (ordering *in camera* review of video footage after the agency failed to show that certain images "could not be reasonably segregated from exempt and non-responsive portions of the videos").[49] A court may undertake such review "on the basis of an uneasiness, on

---

[49] If the Court is concerned about the length of the videos, it could review *in camera*, for instance, footage from fifteen minutes before each strike onward.

a doubt [it] wants satisfied before [it] takes responsibility for a de novo determination." *Ray v. Turner*, 587 F.2d 1187, 1195 (D.C. Cir. 1978). And the "importance" of the records at issue amply justifies such review. *ACLU v. FBI*, 429 F. Supp. 2d 179, 186 (D.D.C. 2006).

## CONCLUSION

For the foregoing reasons, the Court should grant The Times's cross-motion for summary judgment and deny the Department's motion for summary judgment.

Dated: July 9, 2026
     New York, New York

*/s/ David McCraw*
David McCraw
Jackson Busch
The New York Times Company
Legal Department
620 8th Avenue
New York, NY 10018
Phone: (212) 556-4031
Email: mccraw@nytimes.com
     jackson.busch@nytimes.com

*Attorneys for Plaintiffs*

22

## CERTIFICATION OF COMPLIANCE

I certify that this document complies with the word count requirements of Local Civil Rule 7.1(c). According to the word count in Microsoft Word, which was used to prepare this brief, the number of words in this document, excluding the caption, any index, table of contents, table of authorities, signature blocks, and this certificate, is 7,322 words.

Dated: July 9, 2026                                      */s/ David McCraw*
      New York, New York                        David McCraw