**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| THE NEW YORK TIMES COMPANY and CHARLIE SAVAGE,<br><br>               Plaintiffs,<br><br>    v.<br><br>DEPARTMENT OF DEFENSE,<br><br>               Defendant. | No. 25-cv-9375 |

**REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF PLAINTIFFS'**
**CROSS-MOTION FOR SUMMARY JUDGMENT**

David McCraw
Jackson Busch
The New York Times Company
Legal Department
620 8th Avenue
New York, NY 10018
Phone: (212) 556-4031
Email: mccraw@nytimes.com
      jackson.busch@nytimes.com

*Attorneys for Plaintiffs*

i

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES .................................................................................................ii

PRELIMINARY STATEMENT ......................................................................................... 1

ARGUMENT...................................................................................................................... 1

    I.    The Supplemental Buria Declaration, like the Buria Declaration before it, does not logically and plausibly support withholding all the remaining footage. .................. 1

    II.    Footage of critical events before and after the strikes is segregable and must be released. ............................................................................................................... 3

        A.    The boat's turnaround before the September 2 strike. .......................................... 4

        B.    The September 2 follow-on strike. ........................................................................ 5

        C.    The failure to rescue the survivor of the October 27 strikes. ............................... 5

    III.    The record is sufficient to suggest that the footage was impermissibly withheld to conceal violations of law or avoid embarrassment....................................................... 6

    IV.    The previously released clips are an official disclosure. ............................................... 9

    V.    *In camera* review is appropriate here. ....................................................................... 10

CONCLUSION.................................................................................................................. 11

## TABLE OF AUTHORITIES

**Cases**

*ACLU v. DOD*, 389 F. Supp. 2d 547 (S.D.N.Y. 2005) .................................................................. 6, 8

*ACLU v. DOD*, 901 F.3d 125 (2d Cir. 2018) ........................................................................ 2, 3, 7

*ACLU v. Office of the Dir. of Nat'l Intelligence*, 2011 WL 5563520 (S.D.N.Y. Nov. 15, 2011) ...................................................................................................................................... 7, 11

*AP v. FBI*, 265 F. Supp. 3d 82 (D.D.C. 2017) ................................................................................ 8

*Carney v. DOJ*, 19 F.3d 807 (2d Cir. 1994) .................................................................................. 8

*Gov't Accountability Project v. CIA*, 548 F. Supp. 3d 140 (D.D.C. 2021) .................................... 7

*N.Y. Times Co. v. DOJ*, 2016 WL 5946711 (S.D.N.Y. Aug. 18, 2016) ........................................ 6

*N.Y. Times Co. v. DOJ*, 756 F.3d 100 (2d Cir. 2014) .............................................................. 9, 10

N.*Y. Times Co. v. FBI*, 2024 WL 325273 (S.D.N.Y. Jan. 29, 2024) ............................................. 7

*N.Y. Times Co. v. FBI*, 297 F. Supp. 3d 435 (S.D.N.Y. 2017) ...................................................... 6

*Nat'l Immigration Project of the Nat'l Lawyers Guild v. DHS*, 842 F. Supp. 2d 720 (S.D.N.Y. 2012) ......................................................................................................................... 3

*Osen LLC v. United States Cent. Command*, 969 F.3d 102 (2d Cir. 2020) ............................. 9, 10

**Other Authorities**

Executive Order 13,526, 75 Fed. Reg. 707 (Dec. 29, 2009) ........................................................... 6

Plaintiffs The New York Times Company and Charlie Savage (together, "The Times") respectfully submit this reply in further support of their cross-motion for summary judgment.

## PRELIMINARY STATEMENT

Days after each of the lethal military strikes at issue here, the Department of Defense (the "Department") promoted the campaign by releasing video montages of the attacks on social media. But the public soon learned, through news reporting, statements by executive branch officials, and disclosures from members of Congress, that this edited footage did not tell the whole story. Instead, at least three critical events, all of which undercut the Department's legal justification or public narrative in support of the strikes, were left out: (1) the moment that the boat targeted in the September 2 strike turned around before it was hit, (2) the moment that survivors of the September 2 strike were killed in a second strike, and (3) the moment that a survivor of the October 27 strikes was not rescued. Now asked to provide the public with a fuller record—one that will help answer important questions about the legality of the strikes—the Department continues to urge that it has already released, down to the second, precisely as much footage of the strikes as it can without harming national security. The Court should reject this implausible claim, grant The Times's motion, and order additional footage released.

## ARGUMENT

**I.      The Supplemental Buria Declaration, like the Buria Declaration before it, does not logically and plausibly support withholding all the remaining footage.**

The Department attempts to salvage its case with another declaration from Ricky D. Buria, Secretary Hegseth's Chief of Staff. ECF No. 36 ("Supp. Buria Decl."). This declaration offers more of the same. Like the Buria Declaration before it, ECF No. 31 ("Buria Decl."), it does not logically and plausibly support withholding all the remaining footage.

1

The new declaration's core claim is that any additional footage, unlike the previously released montages, would offer a "trove of information . . . to sophisticated adversaries." Supp. Buria Decl. ¶ 3. But, like the Buria Declaration, it understates the effect of the earlier releases and fails to explain this alleged harm in enough detail for the Court to evaluate the logic and plausibility of the asserted justification. It claims that the previous releases "revealed little sensitive information, such as the mere fact that the U.S. military had the capability to record the impacts." *Id.* ¶ 4. But even a casual viewing of the social media montages reveals that is not so. The montages show the boats immediately before, during, and after the strikes, from multiple camera angles with different capabilities and degrees of magnification. The declaration nonetheless goes on to say that, unlike the montages, additional footage "would more thoroughly depict extensive surveillance and tracking capabilities" by showing how the military can track vessels "at varying altitudes, using multiple degrees of magnification." *Id.* But, again, much of this information was already revealed by the montages. If disclosure of these capabilities were so damaging, those videos would never have been released. As a result, the Department fails to meet the fundamental test for withholding: "A sufficient justification must be logical *and* plausible." *ACLU v. DOD*, 901 F.3d 125, 134 n.9 (2d Cir. 2018).

It may be that some of the footage at issue is properly classified. And there is no question that some part of the footage can be released without harm, as the Department showed with its highlight reels from the strikes. The critical inquiry is whether the Department has adequately explained the difference between the two categories (and whether, as discussed further below, it has addressed documented concerns that some parts of the footage may have been withheld for the improper purpose of covering up misconduct). The explanations in both declarations fall short.

**II.    Footage of critical events before and after the strikes is segregable and must be released.**

The crux of the Supplemental Buria Declaration is that not a single additional second of footage can be segregated and released. *Compare* Supp. Buria Decl. ¶ 7 ("I reaffirm that no reasonable segregation and release of non-exempt information is possible beyond what is already in the public domain."), *with* Buria Decl. ¶ 13 ("I conclude that no reasonable segregation and release of non-exempt information is possible beyond what is already in the public domain."). But it does not provide the "detailed justification" that the law requires. *Nat'l Immigration Project of the Nat'l Lawyers Guild v. DHS*, 842 F. Supp. 2d 720, 725 n.5 (S.D.N.Y. 2012).

To advance its argument, the declaration engages in a superficially appealing but ultimately inconsequential reframing. As The Times explained in its opening brief, the original Buria Declaration did not meet its burden on segregability because it focused on the harm that could arise from release of the full-length videos. ECF No. 34 ("Times Br.") at 20-21. In response, the Supplemental Buria Declaration refocuses on the incremental harm that could flow from release of additional footage. *See* Supp. Buria Decl. ¶ 5 ("These details accumulate over time . . . ."); *id.* ("[A]s the length of footage disclosed increases, so too does the risk of damage to national security."). But the tipping point at which this damage occurs remains obscured. Would release of another minute of footage cause the harm alleged in the declaration? Another 10 seconds? Another five? The declaration does not say. Though agency declarations are entitled to deference on matters of national security, they must still provide the Court "sufficient information to evaluate whether [the agency's] judgments were logical and plausible." *ACLU*, 901 F.3d at 134. This declaration seems designed to muddle, rather than aid, any judicial-line drawing.

Compounding this shortcoming, neither declaration attempts to specify what the footage shows in its various portions and which of these portions would cause the asserted harm. This is

3

critical here. The responsive videos are over ten hours long, with most of the footage apparently depicting the surveillance of the boats in the several hours before each strike. Buria Decl. ¶ 3. Release of least some of the footage does not present national security concerns, as the Department showed by disclosing the montages. Yet the Department treats the remaining footage as a largely undifferentiated mass.

This treatment is insufficient. At a minimum, the Department should be required to produce an index identifying the sections of the footage and what specific national security concerns are implicated in each. But even on the current record, the Department has failed to demonstrate that footage depicting three critical moments identified by The Times cannot be segregated and released. Those moments likely occurred close in sequence to the strikes and were over in minutes or even seconds. Even if it is logical and plausible that the release of long sections of additional footage would damage national security, neither declaration shows that release of these short clips would cause the same harm.[1]

A. *The boat's turnaround before the September 2 strike.*

Before it was hit, the boat targeted in the September 2 strike reportedly turned around, undercutting the Department's claim that it was imminently attacking the United States. Times Br. at 3. The footage depicting this discrete event could be segregated and released. Though The Times cannot state with certainty how long before the strike this event took place and how long the footage depicting it is, it is plausible that the turnaround occurred shortly before the boat was struck and likely that it took place in a matter of minutes. This additional clip, therefore, would not reveal "extensive surveillance and tracking capabilities . . . across large swathes of international waters, over long durations." Supp. Buria Decl. ¶ 4.

---

[1] In addition, The Times does not object to the redaction of text that appears in the video footage, which presumably captures altitude, heading, or other details. Such information was redacted in the previously released montages.

B. *The September 2 follow-on strike.*

The most important moment not depicted in the previously released footage is the follow-on attack that killed two shipwrecked survivors of the September 2 strike. This event alone has touched off extensive media coverage, congressional debate, and an acknowledgement from the White House podium. Times Br. at 3, 7. Footage depicting it could likewise be segregated and released.

Though the Department devotes special attention to this portion of the responsive footage, its justifications are particularly unpersuasive. It says that releasing any footage from after the initial strikes would show "the aftereffects of different munitions and specific types of targeting systems." Supp. Buria Decl. ¶ 6. Left unexplained is precisely what it would reveal (beyond that the munitions succeeded in blowing up a small boat) and how that information would differ from what has already been disclosed in the montages (which likewise show munitions blowing up small boats). It alleges that the footage is "inexorably tied" to real-time assessment of the strikes' effectiveness—though notably does not say that it would reveal anything about those assessments. *Id.* And it claims that even the lapse of time "between initial and follow-on strikes" is secret, as it "would reveal the speed at which information and decisions flow across the chain of command," and that those details "are applicable to military forces worldwide." *Id.* But this claim—that the timing for this particular mission could be extrapolated to every other military operation around the world—is simply not plausible. Each mission is distinct across many dimensions, and it is hardly novel to suggest that the U.S. military has the capability to monitor operations and provide feedback in real time.

C. *The failure to rescue the survivor of the October 27 strikes.*

A third critical moment not captured by the previously released footage is the point when the sole survivor of the October 27 strikes disappeared below the waves. This clip could also be

5

segregated and released. Like the clips discussed above, the relevant footage is likely brief and close in time to the previously released footage depicting the moments of impact. And many of the Department's justifications for withholding post-strike footage do not apply. This footage presumably does not reveal "munitions" or "targeting systems," and does not depict any "follow-on strikes." *Id.* Since the survivor was not rescued, it likely does not depict any military assets at all.

### III.    The record is sufficient to suggest that the footage was impermissibly withheld to conceal violations of law or avoid embarrassment.

"Information may not be classified for the purpose of concealing wrongdoing." *N.Y. Times Co. v. DOJ*, 2016 WL 5946711, at *8 (S.D.N.Y. Aug. 18, 2016). This basic rule stems from the text of the classification executive order itself, which provides that "[i]n no case shall information be classified, continue to be maintained as classified, or fail to be declassified" to "conceal violations of law, inefficiency, or administrative error" or "prevent embarrassment to a person, organization, or agency." Executive Order 13,526 § 1.7(a), 75 Fed. Reg. 707 (Dec. 29, 2009). The record here—documenting concerns that the withheld footage shows illegal acts—is sufficient to suggest that these impermissible motives influenced the Department's classification decision. This Court is empowered to prevent this improper use of the classification system.

Tellingly, the Department's main response is to quibble with the record's scope and fall back on the presumption of regularity. But materials in the public domain are properly before the Court. *N.Y. Times Co. v. FBI*, 297 F. Supp. 3d 435, 445 (S.D.N.Y. 2017) ("[T]he Court has considered the publicly available information cited by the parties, including . . . official statements made by [government officials] and various newspaper articles cited by the Times."); *ACLU v. DOD*, 389 F. Supp. 2d 547, 564 (S.D.N.Y. 2005) (citing "discussions . . . in the public press"). The Department does not dispute that the Court may consider official government statements or

6

the "substantial public debate about the strikes, including [among] members of Congress." ECF No. 37 ("Gov't Opp.") at 5. As for the news articles cited by The Times, the Court need not accept the statements contained in the articles for their truth to consider the fact that those statements were made, the fact that those articles were published, and what those facts reveal about the public debate over the Department's conduct. N.*Y. Times Co. v. FBI*, 2024 WL 325273, at \*4 n.1 (S.D.N.Y. Jan. 29, 2024) (taking "judicial notice of the content of public reporting and disclosures . . . for the fact of their existence and not for the truth of their contents"). The point of bringing the articles into this record is to show the heightened public interest in the strikes, the serious public debate over their legality, and the likelihood that additional footage would inform that debate.

Putting this all together raises a plausible inference that the Department classified at least some of the additional footage (or kept it classified) for impermissible reasons. As detailed in The Times's opening brief, the Department has withheld footage that could undercut its legal justifications for the strikes, undermine it in the court of public opinion, and possibly even expose it to legal liability. This case is thus distinct from those where the requester offered "no evidence" in support of its claims of agency misconduct, *Gov't Accountability Project v. CIA*, 548 F. Supp. 3d 140, 157 (D.D.C. 2021), or where the government's submissions are not "contradicted by the record." AC*LU*, 901 F.3d at 136.

In the face of this record, the Supplemental Buria Declaration offers little comfort. Though prepared in response to The Times's opening brief, Times Br. at 16-18, the declaration says nothing about the legality of the operations and does not rebut the claims that the footage was withheld to conceal violations of law. *Cf. ACLU v. Office of the Dir. of Nat'l Intelligence*, 2011 WL 5563520 (S.D.N.Y. Nov. 15, 2011) (finding a declaration insufficient in part because it failed to adequately address the release of "information regarding alleged misuse and abuse" of government authority).

7

Nor does it mention the robust legal debate surrounding the strikes or the role that debate played in the classification decision. *See ACLU*, 389 F. Supp. 2d at 565 (criticizing a declaration for failing to "reflect any discussion within the administration [about] whether the particular methods [discussed in the records] might constitute a violation of law" (cleaned up)). As for avoiding embarrassment, the declaration states only that "[e]mbarrassment is no factor in the protection of our most sophisticated capabilities." Supp. Buria Decl. ¶ 6. This carefully worded sentence is phrased as a general statement of practice, not linked to the specific classification decision at issue. It is revealing that, even after taking another opportunity to explain its decision-making process, this is the most the Department is willing to say under oath.

At bottom, The Times is limited to the evidence available to it. It cannot be expected, without the opportunity to conduct discovery, to produce inside information about the Department's classification process. But that is why the presumption of good faith is a rebuttable one. *See Carney v. DOJ*, 19 F.3d 807, 812-13 (2d Cir. 1994) (collecting examples in which the presumption was rebutted, including where "press accounts suggest[ed]" an exemption did not apply, agency declarations "included conflicting information," and agency declarations were inadequately reasoned). Even setting aside whether the Department is entitled to a presumption of regularity in this case, *see* Times Br. at 9-10, 17 (detailing the Department's litigation conduct), or in general,[2] that presumption may be overcome when the plaintiff provides "more than conjecture." *AP v. FBI*, 265 F. Supp. 3d 82, 96 (D.D.C. 2017). Where, as here, the record suggests that the Department is withholding information that could undercut the legal and political justification for its actions, and the Department provides nothing but bare assertions to the

---

[2] Ryan Goodman et al., *The "Presumption of Regularity" in Trump Administration Litigation*, Just Security (Mar. 19, 2026), https://www.justsecurity.org/120547/presumption-regularity-trump-administration-litigation (collecting cases in which courts around the country—including in this district—have recently questioned whether the federal government still merits this presumption).

contrary, the Court should conclude that the footage was impermissibly classified to conceal violations of law or avoid embarrassment.

**IV.    The previously released clips are an official disclosure.**

There is another basis for ordering release of at least some of the withheld footage. The release of montages from each of the strikes showing, from multiple angles and degrees of magnification, the moments of impact along with brief periods before and after the strikes constitutes an official disclosure that waives the claim that any remaining footage making comparable disclosures can be kept hidden. Having decided that release of certain segments of the videos is permissible, the Department cannot now claim that comparable information found elsewhere in the footage is a secret. In arguing otherwise, the Department attempts to transform the official disclosure test from one that is merely "strict," *Osen LLC v. United States Cent. Command*, 969 F.3d 102, 109 (2d Cir. 2020) (citation omitted), to one that would require "absolute identity" between the released and withheld information, *N.Y. Times Co. v. DOJ*, 756 F.3d 100, 120 (2d Cir. 2014). The Court should decline this invitation.

The Department disputes only the specificity and matching prongs of the official disclosure test, but both are satisfied here. "[S]pecificity concerns the quality or kind of information about a particular topic that has been produced to the public." *Osen*, 969 F.3d at 110. Though the Department argues that the additional footage is "different in the specific national security information [it] contain[s]," Gov't Opp. at 7, those differences are significantly overstated, *see supra* Parts I, II. As for matching, the relevant inquiry is whether the released and withheld records "overlap in [their] subject matter." *Osen*, 969 F.3d at 112; *see also id.* ("Matching, by comparison to specificity, is . . . a question of what topics have already been produced to the public."). Both sets of records concern the strikes at issue, along with their immediate run-up and aftermath. *Osen* is thus distinguishable on this point for the reasons the Department suggests: the records there did

not match because they concerned different events, while the records here are about the same strikes. *Id.* at 112-13 ("[T]he prior disclosures say nothing about the attacks from which images . . . have never been disclosed.").

Of course, the additional footage at issue is not precisely the same as the previously released montages, as The Times recognized in its opening brief. Times Br. at 19. But that is not the test. The Second Circuit has made clear that the matching requirement, while strict, does not "require absolute identity," as no rational FOIA requester would litigate to obtain records that are already in the public domain. *N.Y. Times Co.*, 756 F.3d at 120. The purpose of this doctrine is to hold the government accountable for its disclosure decisions and prevent it from withholding in a FOIA case what it has chosen to reveal elsewhere. This is especially critical where, as here, the already-disclosed footage gives the public an incomplete and incorrect picture of the events at issue. Because it chose to release videos depicting the strikes, the Department cannot now claim that comparable footage depicting those same events is secret.

## V.  *In camera* review is appropriate here.

If it is not yet prepared to order the release of additional footage, the Court should review the footage (or key portions of it) *in camera*. As the Department recognizes, *in camera* review is appropriate where an agency's declarations do not offer enough detail for the Court to engage in meaningful review. Gov't Opp. at 10. For the reasons already explained, that is the case here.

The Court should also reject the Department's suggestion that it is insufficiently capable or qualified to review the footage (or key portions) itself. The Department repeatedly emphasizes that the videos are replete with sensitive information that "appears to the untrained eye as seemingly innocuous details." Supp. Buria Decl. ¶ 3; *see also id.* ¶ 5 ("This intelligence mosaic is not self-evident . . . ."). But even if that were true, it is the Department's obligation to explain how release of these "seemingly innocuous details" would endanger national security, so that the Court

may discharge its own "independent responsibility to review agency determinations de novo[.]" *ACLU*, 2011 WL 5563520, at *5 (cleaned up). Where the Department has failed to do so is exactly the circumstance in which *in camera* review is warranted.

## CONCLUSION

For the foregoing reasons and those set forth in The Times's opening brief, the Court should grant The Times's cross-motion for summary judgment.

Dated: August 6, 2026
      New York, New York

/s/ David McCraw
David McCraw
Jackson Busch
The New York Times Company
Legal Department
620 8th Avenue
New York, NY 10018
Phone: (212) 556-4031
Email: mccraw@nytimes.com
      jackson.busch@nytimes.com

*Attorneys for Plaintiffs*

11

## CERTIFICATION OF COMPLIANCE

I certify that this document complies with the word count requirements of Local Civil Rule 7.1(c). According to the word count in Microsoft Word, which was used to prepare this brief, the number of words in this document, excluding the caption, any index, table of contents, table of authorities, signature blocks, and this certificate, is 3,422 words.

Dated: August 6, 2026                                    */s/ David McCraw*
      New York, New York                          David McCraw